WALLACE, Circuit Judge,
dissenting
The majority holds that section 116.3116 et seq. of the Nevada Revised Statutes (HOA Statute) is facially unconstitutional because it fails to satisfy the Fourteenth Amendment’s Due Process Clause. I dissent for two reasons. First, both the Supreme Court’s case law and our own precedent make it clear that for a due process challenge to succeed, the challenger must *1161 show that there has been “overt official involvement,” or, in other words, state action. Because there has been no state action here, I would hold that Wells Fargo’s challenge necessarily fails. Second, even were there sufficient state action to implicate the Due Process Clause, the HOA Statute satisfies due process because it incorporates another provision in the Nevada Revised Statutes that requires the homeowners’ association (HOA) to provide written notice to a mortgage lender.
I.
A foundational principle for all constitutional law is that “most rights secured by the Constitution are protected only against infringement by governments.” Flagg Bros., Inc. v. Brooks, 436 U.S. 149, 156, 98 S.Ct. 1729, 56 L.Ed.2d 185 (1978). Thus, “[wjhile as a factual matter any person with sufficient physical power may deprive a person of his property, only a State or a private person whose action may be fairly treated as that of the State itself, may deprive him of an interest encompassed within the Fourteenth Amendment’s protection.” Id. at 157, 98 S.Ct. 1729 (internal quotation marks omitted). This understanding has led to what is commonly termed the state action requirement. To determine whether there has been state action, the Supreme Court has “insisted that the conduct allegedly causing the deprivation of a federal right be fairly attributable to the State.” Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982). The fair-attribution test has two parts: (1) “the deprivation must be caused by the exercise of some right or privilege created by the State or by a rule of conduct imposed by the state or by a person for whom the State is responsible,” and (2) “the party charged with the deprivation must be a person who may fairly be said to be a state actor.” Id.
Here, only the second part of the fair-attribution test is atdssue, since there is no doubt that the deprivation. Wells Fargo has alleged was caused by Bourne Valley’s exercise of “some right or privilege” created by Nevada’s HOA Statute. Id. But that still leaves the second part of the test, that is, whether Bourne Valley “may fairly be said to be a state actor.” Id. The answer to that question is no.
The majority concedes, as it must, that the nonjudicial foreclosure sale that resulted in Bourne Valley obtaining title to the property does not count a® state action. This makes common sense: an HOA is not a government actor and a nonjudicial foreclosure by definition takes place without government involvement. So, if the foreclosure itself does not constitute state action, how then does the majority reach the merits of the Due Process issue? It does so by holding “that the enactment of the [HOA] Statute unconstitutionally degraded its interest in the Property.” This holding is faulty in several respects.
First, it is wrong as a matter of timing. The HOA Statute cannot possibly have “degraded” Wells Fargo’s interest in the property because it was passed long before the bank acquired its interest. The Nevada legislature passed the HOA Statute in 1991; Wells Fargo’s mortgage interest was created in 2006.[1] Given this timing, how can the majority claim that the “enactment” of the HOA Statute “degraded” Wells Fargo’s interest?
The second, and more critical, problem •with the majority’s holding is that it misapplies the case law. In Apao v. Bank of New York, we dealt with a due process *1162 challenge to a Hawaii statute that authorized a lender to exercise a contractual right to nonjudicial foreclosure if the borrower defaulted on the loan. 324 F.3d 1091, 1092-93 (9th Cir. 2003). In rejecting that argument, we reviewed the Supreme Court’s cases involving foreclosures or seizures of property to satisfy a debt, and we concluded that “the Supreme Court has held that the procedures implicate the Fourteenth Amendment only where there is at least some direct state involvement in the execution of the foreclosure or seizure.” Id. at 1093.
To illustrate how the Court has applied that rule, we cited several cases where the Court concluded there was state action. In one case, the Court held there was state action where a clerk of court issued a writ of replevin authorizing a sheriff to seize property. Fuentes v. Shevin, 407 U.S. 67, 70-71, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972). In another, the Court held there was sufficient state involvement where a clerk of court issued a summons at the request of a creditor, which allowed the creditor to garnish an individual’s wages. Sniadach v. Family Fin. Corp. of Bay View, 395 U.S. 337, 338-40, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969). Last, in Lugar, the Court held there was state action where a sheriff sequestered property upon executing a creditor’s petition for a writ of prejudgment attachment. 457 U.S. at 924-25, 102 S.Ct. 2744. The common thread among these three cases is that each involved a government actor taking some official action.
By contrast, the Court had concluded there was insufficient state involvement to support satisfaction of the state action requirement where a creditor enforced a lien through a nonjudicial sale. Flagg Bros., Inc., 436 U.S. at 152-53, 98 S.Ct. 1729. Importantly for the case before us, the Court reached its holding even though the creditor derived its power to conduct the sale from a state statute that delegated “to the [creditor] a portion of its sovereign monopoly power.” Id. at 155, 98 S.Ct. 1729 (internal quotation marks omitted). We described the Court’s reasoning in Flagg Brothers as follows:
Flagg Bros, further held that the state’s statutory authorization of self-help provisions is not sufficient to convert private conduct into state action. The statute neither encourages nor compels the procedure, but merely recognizes its legal effect. The state has not compelled the sale of a [debtor’s property], but has merely announced the circumstances under which its courts will not interfere with a private sale.
Apao, 324 F.3d at 1094(internal quotation marks and citations omitted). In short, Flagg Brothers came out the way it did because there was no “overt official involvement.” Apao, 324 F.3d at 1095 (internal quotation marks omitted).
Returning to our decision in Apao, after tracing the Supreme Court’s case law, we then applied it to the Hawaii statute. We concluded that the facts were analogous to Flagg Brothers because nonjudicial foreclosure procedures lack any “overt official involvement.” Id. (quoting Flagg Bros., Inc., 436 U.S. at 157, 98 S.Ct. 1729).
Apao is also important because we rejected a broader theory of state action that the borrower proposed. The borrower in Apao made an argument similar to the one Wells Fargo has made here: that government regulation of the mortgage business converted any action by a lender into state action. Id. We rejected that argument, holding that “the development of the extensively regulated secondary mortgage market does not convert the private foreclosure procedures at issue here into state action.” Id. We explained that “ ‘[statutes and laws regulate many forms of purely private activity, such as contractual rela *1163 tions and gifts, and subjecting all behavior that conforms to state law to the Fourteenth Amendment would emasculate the state action concept.’ ” Id. (quoting Adams v. S. Cal. First Nat’l Bank, 492 F.2d 324, 330-31 (9th Cir. 1974)).
The Supreme Court’s decisions in Fuentes, Sniadach, Lugar, and Flagg Brothers, dictate that we conclude there has been no state action in this case. There has been no “overt official involvement”: no government actor was in any way involved in the nonjudicial foreclosure that resulted in Bourne Valley holding title to the property. The majority attempts to distinguish this line of cases by observing that in Flagg Brothers, the parties had a preexisting contractual relationship. But the Court’s holding focuses on “overt official involvement,” not preexisting relationships.
Nor can the operation of the HOA Statute alone provide a basis for finding sufficient state action. Adams so holds and there is no basis — and the majority offers none — on which we might either distinguish that case or depart from its rule.
Because there has been no “overt official involvement” in this case, I would hold that Wells Fargo has failed to demonstrate the necessary state action that is needed for it to succeed on its Due Process Clause argument.
II.
Even if there were any state action, Wells Fargo’s due process challenge fails because the HOA Statute requires an HOA to provide a mortgage lender with a notice of default, satisfying due process.
Due process demands that “in any proceeding which is to be accorded finality,” interested parties must receive “notice reasonably calculated, under all the circumstances, to apprise [them] of the pen-dency of the action and afford them an opportunity to present their objections.” Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 314, 70 S.Ct. 652, 94 L.Ed. 865 (1950). The Supreme Court has held that a lender’s mortgage interest is protected as “property” under the Due Process Clause. Mennonite Bd. of Missions v. Adams, 462 U.S. 791, 798, 103 S.Ct. 2706, 77 L.Ed.2d 180 (1983). In that same case, the Court also held that “constructive notice alone does not satisfy” the demand of due process, id. The issue we confront here is whether the HOA Statute meets these demands.
As the majority points out, most of the notice provisions in the HOA Statute create an opt-in framework, meaning that interested parties will receive notice only if they affirmatively request it. But one of its notice provisions, found in section 116.31168(1) (2005), departs from that framework. That subsection provides that “[t]he provisions of NRS 107.090 apply to the foreclosure of an association’s lien as if the deed of trust were b$ing foreclosed.” Nev. Rev. Stat. § 116.31168(1). In turn, section 107.090(3) provides as follows:
The trustee or person authorized to record the notice of default shall, within 10 days after the notice of default is recorded and mailed pursuant to NRS 107.080, cause to be deposited in the United States mail an envelope, registered or certified, return receipt requested and with postage prepaid, containing a copy of the notice, addressed to:
(a) Each person whp has recorded a request for a copy of the notice; and
(b) Each other person with an interest whose interest or claimed interest is subordinate to the deed of trust.
Thus, in relevant part, the statute requires the “person authorized to record the notice of default” (here, the HQA) to mail a copy of the notice of default to “[e]ach other person with an interest ¡whose interest or claimed interest is subordinate to the deed *1164 of trust.” A lender like Wells Fargo clearly has an “interest” in the soon-to-be foreclosed property since it has a recorded security interest in it. The lender’s security interest is also “subordinate” to the HOA’s lien by virtue of the HOA Statute’s superpriority provision. This is the' case even though the lender’s security interest was recorded first, since the superpriority provision. provides that an HOA lien “is ... prior to all security interests.” Nev. Rev. Stat. § 116.3116(c) (2005). Further, we must read the term “deed of trust” in section 107.090 to mean an HOA lien since section 116.31168 provides that “[t]he provisions of [section] 107.090 apply to the foreclosure of an association’s lien as if a deed of trust were being foreclosed.”
In essence, while section 107.090 does not by itself apply to HOA liens, the HOA Statute expressly incorporates section 107.090 so that it applies to HOA liens. And section 107.090’s notice provisions require an HOA to send a notice of default to “[e]ach other person” with a subordinate interest. Thus, under the HOA Statute, due process is satisfied because “[e]ach other person with an interest ... [that] is subordinate to the [HOA lien]” receives “notice, reasonably calculated, to apprise [them] of the pendency of the action.” Múlleme, 339 U.S. at 314, 70 S.Ct. 652.
The majority disagrees with this reading of the statutes. It does so because, according to it, “Bourne Valley’s preferred reading would impermissibly render the express notice provisions of Chapter 116 entirely superfluous.” In essence, the majority rejects the most obvious reading of the statute by relying on a single canon of construction — the surplusage canon.
The surplusage canon has deep roots in statutory interpretation and arises out of the recognition that “words cannot be meaningless, else they would not have been used.” United States v. Butler, 297 U.S. 1, 65, 56 S.Ct. 312, 80 L.Ed. 477 (1936). But the canon is not without limitations. Most importantly here, the surplus-age canon cannot overcome straightforward textual meaning. See AntoNIN Scalia & BRYAN A. Garner, Reading Law 176 (“Put to a choice, however, a court may well prefer ordinary meaning to an unusual meaning that will avoid surplusage.”). That limitation precludes use of the canon here because there is no reasonable way to interpret sections 116.31168 and 107.090 other than to conclude that they mandate that an HOA provide a mortgage lender with the notice of default. The majority tacitly acknowledges this conclusion by offering no contrary reading of those statutes. Instead, the majority applies the sur-plusage canon without even attempting to provide a reading of the statutes that is contrary to the one I have provided. This use of the surplusage canon is backwards; courts should not apply the canon without first deciding that there are at least two potential readings of the statute (one that renders parts superfluous and one that does not).
Ironically, the surplusage canon could also work against the majority’s position. Reading section 116.31168 as the majority does renders the HOA Statute’s command that “[t]he provisions of [section] 107.090 apply to the foreclosure of an association’s lien as if a deed of trust were being foreclosed” mere surplusage since refusing to heed section 116.31168’s incorporation of section 107.090 renders both sections irrelevant for purposes of the HOA Statute.
A larger problem with the majority’s analysis is that it ignores another canon of construction that is at least on a par with the surplusage canon, namely the constitutional doubt canon. The Supreme Court has explained that under the constitutional doubt canon, “[w]hen the validity of an act of the [legislature] is drawn in question, and even if a serious doubt of constitution *1165 ality is raised, it is a cardinal principle that this Court will first ascertain whether a construction of the statute is fairly possible by which the question may be avoided.” Crowell v. Benson, 285 U.S. 22, 62, 52 S.Ct. 285, 76 L.Ed. 598 (1932).
As an example of how the constitutional doubt canon works, take the Supreme Court’s decision in National Federation of Independent Business v. Sebelius, — U.S. -, 132 S.Ct. 2566, 183 L.Ed.2d 450 (2012). There, five justices concluded that the Commerce Clause could not support Congress’s enacting of the individual mandate imposed by the Patient Protection and Affordable Care Act of 2010. Id. at 2591 (opinion of Roberts, C.J.); id, at 2643 (dissenting opinion of Justices Scalia, Kennedy, Thomas, and Alito). But, rather than strike the statute down, the Court found the statute constitutional under Congress’s power to tax. Id. at 2595-96. The Court explained its rationale for reaching the taxing power issue as follows:
The question is not whether [reading the statute as being within Congress’s power to tax] is the most natural interpretation of the mandate, but only whether it is a “fairly possible” one. As we have explained, every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.
Id. at 2594(internal quotation marks and citations omitted).
While sections 116.31168 and 107.090 of the Nevada Revised Statutes seem to me to be sufficiently straightforward that I would not rely on the constitutional doubt canon in the first instance (again, the majority offers no interpretation of them that contradicts mine), even if there were a reasonable reading of them that would raise due process concerns, I would apply the constitutional doubt canon and conclude that the constitutional reading is “fairly possible.” Id. Because it is “fairly possible” to find a reasonable reading of the HOA Statute that renders it constitutional, that construction “must be resorted to.” Id.
By resorting to a faulty application of the surplusage canon without even applying the constitutional doubt canon, the majority selectively picks and chooses among tools of statutory interpretation so that it can reach its desired outcome. That is not the role of judges. Our role is not to decide whether the HOA Statute was good policy. Indeed, it appears that it was not, as the Nevada legislature has reworked the statute so that the concerns articulated by Wells Fargo are no longer at issue. See S.B. 306 (Nev. 2015). But none of that should concern us. We are tasked only with deciding whether the HOA Statute required HOAs to send lenders actual notice. Because its terms leave no doubt that they were required to, we should uphold it.
III.
Wells Fargo’s due process challenge fails in multiple respects. First, because there has been no “overt official involvement,” there is no state action that would justify reaching the merits of the due process argument. Second, even were there state action, the HOA Statute satisfies due process by requiring HOAs to send lenders a notice of default., Accordingly, I would reject Well Fargo’s arguments and affirm the district court’s judgment.

. The HOA Statute has been amended multiple times since 1991. However, since the beginning it has provided that an HOA lien is prior to a first security interest “to the extent of the assessments for common expenses.” Nev. Rev. Stat. § 116.3116(2) (1991).